1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT FOR THE

8                           EASTERN DISTRICT OF CALIFORNIA

9

JOSE MARIA DIAZ ZEPEDA,                )        1:10cv0693 OWW DLB
10                                             )
                    Plaintiff,         )        FINDINGS AND RECOMMENDATIONS
11                                             )        REGARDING PLAINTIFF'S
                                       )        SOCIAL SECURITY COMPLAINT
12                                             )
        vs.                            )
13                                             )
MICHAEL J. ASTRUE, Commissioner of     )
14  Social Security,                     )
                                       )
15              Defendant.            )
                                       )
16  ─────────────────────────────────

## BACKGROUND

17
        Plaintiff Jose Maria Diaz Zepeda ("Plaintiff") seeks judicial review of a final decision of the
18
Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance
19
Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the
20
Social Security Act.  The matter is currently before the Court on the parties' briefs, which were
21
submitted, without oral argument, to the Magistrate Judge for findings and recommendations to the
22
District Court.
23
## FACTS AND PRIOR PROCEEDINGS[1]
24
        Plaintiff protectively filed for DIB and SSI on October 25, 2006.  AR 39, 40, 84-88, 89-92.
25

26  ─────────────────────

27        [1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

28

1

1   He alleged disability since September 21, 2006, due to knee problems, liver problems and injury to

2   his ribs.  AR 99-106.  After being denied initially and on reconsideration, Plaintiff requested a

3   hearing before an Administrative Law Judge ("ALJ").  AR 46-50, 52-56, 57.  On April 29, 2008,

4   ALJ Daniel G. Heely held a hearing.  AR 20-38.  ALJ Heely denied benefits on September 3, 2008.

5   AR 9-19.  On February 18, 2010, the Appeals Council denied review.  AR 1-4.

6          Hearing Testimony

7          ALJ Heely held a hearing on April 29, 2008, in Stockton, California.  Plaintiff appeared with

8   his attorney.  Vocational expert ("VE") George A. Meyers also appeared.  AR 12.

9          Plaintiff testified with the assistance of a Spanish-language translator.  AR 22.  Plaintiff

10  informed the ALJ that he spoke very little English.  The ALJ directed him to speak only in Spanish

11  during the hearing.  AR 23.

12         Plaintiff was born in Mexico.  While there, he completed eight years of elementary school.

13  He came to the United States in 1985, where he currently lives with his wife and four children.  He

14  cannot read, write or speak simple English.  AR 23-24.  He has a driver's license, having taken the

15  test in Spanish, and drives about a mile each day taking his kids to and from school.  AR 23-25, 30.

16         Plaintiff testified that he last worked on September 21, 2004, which was when he had an

17  accident.  He receives Workers' Compensation.  His left leg and knees hurt, which is where he was

18  injured on the job.  His back and stomach also bother him.  His liver burst with the accident and he

19  was compressed for about three hours, injuring his back.  He has not had surgery.  The doctor said

20  nothing would change with surgery.  AR 26-27.  Plaintiff uses a cane when he knows that he is going

21  to walk a long distance.  A long distance for him is a mile, which he described as four blocks.  He

22  walks a mile once a week and tries to rest at least half an hour two times a day.  AR 29-30.

23         Plaintiff reported that he has mental problems and has "difficulties remembering things."  He

24  does not see a "mental doctor."  He does not smoke, drink alcohol or use any illegal drugs.  He is not

25  or probation or parole.  AR 27-28.  During the day, he helps his wife cook and clean.  He takes out

26  the garbage and does simple things.  He goes to church about three times a month.  AR 29.

27         The VE also testified and agreed to identify any testimony that differed from the DOT.  The

28

2

VE classified Plaintiff's work over the past 15 years as tractor driver, which is DOT number 929.683-014, and is medium, semiskilled, SVP 3. As performed, it was heavy work with the only transferable skill of operating a tractor safely. AR 32.

For the hypothetical questions, the ALJ asked the VE to assume a person of the same age, education, and past relevant work history as Plaintiff, and who was illiterate in the English language. For the first hypothetical, the ALJ asked the VE to further assume this person could sit, stand and walk less than even two hours each in a normal day, could lift and/or carry less than 10 pounds even occasionally, could never climb, balance, stoop, kneel, crouch or crawl and could never work around hazards, including moving and dangerous machinery. The VE testified that with those limitations a person could not do the tractor job or any other jobs in the California economy. AR 32-33.

For the second hypothetical, the ALJ asked the VE to assume that the individual could sit six hours, could stand and/or walk two hours each with normal breaks, could lift and/or carry 20 pounds occasionally, 10 pounds frequently, but could never push or pull with the left lower extremity. This person could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs and could occasionally balance, stoop, kneel, crouch or crawl. This person also would have to avoid all exposure to hazards, including moving, dangerous machinery or unprotected heights. Additionally, this person could work at jobs involving simple routine tasks. AR 33. The VE testified that this person could not do the tractor driver job, but could do other jobs in the California economy. These other jobs included lens inserter, DOT number 713.687-026, which is sedentary, unskilled, SVP 2, with 2,000 jobs in the state and final assembler of optical goods, 713.687-018, which is sedentary, unskilled, SVP 2, with 1,000 jobs in the state. The VE eroded the base for each of these jobs by 50 percent due to the language and the moving equipment. AR 33-34. The VE identified additional jobs, including assembler of small products, 706.684-022, which is light, unskilled, SVP 2, with 10,000 jobs in the state. The VE eroded the base by 80 percent due to moving machinery and language. He further testified that the DOT does not account for illiteracy in English, so the VE used his experience in dealing with employers and individuals. AR 34-35.

Following questioning by his counsel, Plaintiff testified that he could stand for two hours at

1    one time before he needed to take a break or sit down.  He does not need his cane to stand.  AR 35.

2         Plaintiff's counsel also asked the VE whether it would affect any of the jobs mentioned if the

3    hypothetical person could not do any squatting, kneeling, ladder or walking on uneven ground.  The

4    VE testified that it would not.  If the person needed to use a cane to walk after 15 minutes, it also

5    would not change the VE's answer.  AR 35-36.

6         <u>Medical Record</u>

7    **Physical Evidence**

8         On September 21, 2004, Plaintiff was admitted to trauma surgery at University Medical

9    Center after being involved in a motor vehicle crash.  Plaintiff was driving a big rig that lost control

10   and went into a canal.  Plaintiff sustained a left tibia/fibula plateau fracture, a grade 2 liver

11   laceration, and facial lacerations.  He underwent open reduction and internal fixation of the left lower

12   extremity on September 21 and 24, 2004.  He also had irrigation and repair of his facial laceration.

13   His estimated length of disability was eight weeks.  AR 178-205.

14        Plaintiff was seen by an orthopedist at University Medical Center in October and November

15   2004 and in January 2005.  AR 173-75, 206.  A left knee x-ray taken on January 11, 2005, showed

16   healing fractures of the proximal tibia and the neck of the fibula.  AR 172.

17        Plaintiff received treatment from Dr. Keolanui Chun, a Qualified Medical Examiner, for his

18   Worker's Compensation injury between March 17 and June 2, 2005.  AR 153-170.  On March 17,

19   2005, Dr. Chun completed an initial orthopaedic evaluation.  Plaintiff had pain with ambulation and

20   recurrent swelling, which required use of a single right axillary crutch.  Plaintiff also reported medial

21   calf numbness and left buttock pain.  AR 156-57.  On examination, he was able to walk without any

22   supportive device and did not appear to have any discomfort with walking.  AR 160.  His right knee

23   was normal.  His left knee range of motion was from 0 to 95 degrees, with no effusion and no

24   tenderness of the patella.  Dr. Chun opined that Plaintiff had left quadriceps atrophy and left knee

25   arthrofibrosis.  Dr. Chun recommended that Plaintiff enter post-operative physical therapy.  Plaintiff

26   remained on temporary, total disability.  AR 156-163.

27   ///

28

On April 14, 2005, Plaintiff reported left knee pain, which he described as moderate (7/10) and occurring frequently (50-75%).  Plaintiff used a singe crutch for community distances, but walked independently at home and in the clinic.  On examination, Plaintiff required assistance to walk on his toes and could not walk on his heels.  It was difficult for him to stand on one leg or squat.  He required assistance to kneel or climb stairs.  Dr. Chun noted that Plaintiff demonstrated improved active range of motion, decreased pain, increased endurance, improved muscle performance and improved gait.  Dr. Chun recommended continued physical therapy.  AR 167-68.

On May 5, 2005, Plaintiff reported persistent headaches.  He was to remain off-work for four weeks and switch from a crutch to a cane.  He also was to continue physical therapy.  AR 154.

On June 2, 2005, Dr. Chun noted that Plaintiff had persistent headaches, which were progressively less frequent.  His knee was better and he had good strength.  Plaintiff was to remain off-work for four weeks.  AR 153.

On October 5, 2005, Dr. Stephen B. Berrien completed an Agreed Medical Evaluation.  Following examination, Plaintiff had x-ray evidence of a healed tibial plateau fracture with internal fixation, ACL instability of the left knee with joint effusion and quadriceps atrophy, quadriceps atrophy and weakness of quad function and limitation of range of motion about the knee.  Dr. Berrien felt Plaintiff needed further medical treatment, including either removal of the plate and screws from his left limb and possible arthroscopy of the knee or removal of the plates and magnetic resonance imaging ("MRI").  Dr. Berrien opined that the alignment of Plaintiff's knee joint had been disturbed substantially on the injured side and there may be substantial internal derangement of the articular surfaces that had not yet been appreciated.  AR 250-58.

On November 21, 2005, Dr. William L. Pistel recommended that Plaintiff undergo hardware removal followed by arthroscopy with ACL reconstruction of his left knee.  AR 267-68.  Plaintiff underwent the recommended procedures on December 22, 2005.  AR 316-21.  As part of Plaintiff's post-operative treatment, Dr. Pistel recommended physical therapy.  Plaintiff was to remain off work.  AR 265-66.

///

1    On January 27, 2006, Plaintiff received follow-up treatment with Dr. Pistel.  Plaintiff was

2   still on crutches and had not received physical therapy.  His quad weakness was profound and he

3   needed aggressive physical therapy in order to return to usual and customary activities.  AR 263-64.

4   Thereafter, Dr. Pistel recommended two to three weeks of physical therapy.  AR 261-62.

5    On February 26, 2006, Plaintiff was making little progress in physical therapy.  He reported

6   that his medications helped with pain control.  His Vicodin and Naprosyn were refilled.  AR 287.

7    On February 28, 2006, Harish P. Porecha, M.D., a board certified neurologist, completed a

8   Qualified Medical Examination.  Plaintiff complained of sharp pains in his head and facial numbness

9   since the accident.  On physical examination, Plaintiff's knee flexion was 125/105.  His muscle

10   strength in the knee extensors was grade 5/5 on both sides.  His knee flexion was grade 5/5 on the

11   right and grade 4.5/5 on the left.  Sensation of pain was reduced to the second of the left foot and the

12   distal aspect of the foot.  His cranial exam was within normal limits.  Dr. Porecha indicated that there

13   seemed to be demyelination in the left peroneal nerve, consistent with diabetic neuropathy.  There

14   also was denervation of the leg muscle supplied by the L4-5 nerve root on the left side.  Dr. Porecha

15   opined that Plaintiff's headaches would be considered moderate "in that they produce a marked

16   handicap in his ability to do his daily chores of life when they occur."  AR 228-36.

17    Plaintiff received treatment from Dr. Alan Jakubowski for his knee pain between January 4,

18   2006, and March 5, 2008.  AR 419-441, 444-48, 451.

19    On May 5, 2006, Plaintiff's EMG study was abnormal.  Dr. Jeffrey Scott opined that there

20   was evidence of an old peroneal neuropathy of the left lower extremity.  AR 301-02.

21    On May 15, 2006, Plaintiff continued to complain of anterior left knee pain and left-sided

22   low back pain.  On examination, Plaintiff was able to extend and flex his left knee with complaints

23   of pain.  He also had restricted flexion and extension in the lumbosacral spine.  Dr. Jakubowski

24   recommended a CT scan of the low back.  Plaintiff was prescribed Ultram and Naprosyn, along with

25   Neurontin at night to assist with neuropathic-type symptoms.  AR 285-86.

26    A lumbar spine MRI on May 31, 2006, revealed mild degenerative disc disease at L4-5 with

27   mild bulging of the annulus fibrosus and a small midline disc protrusion.  There was no disc

28

herniation or spinal stenosis.  AR 249.

On July 10, 2006, Dr. Stephen B. Berrien completed a Qualified Medical Evaluation.  On physical exam, Plaintiff walked with a normal bipedal gait with a cane.  Without a cane, he had a lurching gait.  Weight-bearing films showed collapse of the medial joint compartment on the left lower extremity.  Dr. Berrien identified objective findings of a healed fracture, tibial plateau with derangement of the knee with traumatic arthritis of the knee and a mal-angulation about the proximal tibia with a healed fracture of the fibula with angulation.  There also were findings of perineal nerve palsy, weakness in foot dorsiflexion, weakness in quadriceps extension with atrophy of both the calf and the thigh, and a normal MRI of the lumbosacral spine.  Dr. Berrien opined that Plaintiff had reached the point of maximum medical improvement with regard to his knee.  Plaintiff was not capable of returning to his job in his normal line of work as a laborer.  Dr. Berrien further opined that Plaintiff was precluded from heavy lifting, prolonged weight bearing, climbing, walking over uneven ground, squatting, kneeling, crouching, crawling and pivoting.  Plaintiff needed a cane to walk for extended periods of time.  AR 240-48.

On July 22, 2006, Dr. Benjamin J. Remington evaluated Plaintiff's low back pain.  On examination, Plaintiff's back was non-tender to palpation.  He had very good range of motion and strength was 5 out of 5 in the lower extremities bilaterally with some difficulty of left knee extension due to severe pain.  He also had some numbness in the left lateral leg and top of his foot.  His gait was normal and he had good heel and toe walk.  Plaintiff was not a surgical candidate.  AR 259-60.

On July 27, 2006, Plaintiff complained of left knee, left lower leg and low back pain.  Dr. Jakubowski believed that Plaintiff was at a permanent and stationary basis.  Examination revealed a limp favoring the left leg.  Plaintiff had tenderness over the low back region and restricted motion in the lumbosacral spine.  Plaintiff did not want to use medications because he was afraid of becoming addicted and no medications were prescribed.  AR 283-34.

On August 8, 2006, Frank L. Cantrell, M.D., a neurologist, completed a Qualified Medical Examination.  Plaintiff reported that he had insulin dependent diabetes for the past eighteen years and acknowledged that his blood sugars were poorly controlled.  Plaintiff's major complaint was his

left knee, which was difficult to extend and continued to hurt.  He also complained of headaches two to three times per week.  Plaintiff was not taking medications and he did not wish to take any.  On physical examination, individual muscle testing showed no weakness of the lower limbs, and Plaintiff was able to perform heel walking and toe walking with a left-sided limp.  Dr. Cantrell identified the following: (1) chronic, longstanding diabetes mellitus with severe peripheral neuropathic process, (2) left knee fracture, (3) left rib pain due to old fracture, (4) headaches, post-traumatic in origin, slight, (5) liver laceration by history without evidence of sequelae; (6) facial laceration, well healed, and (7) left peroneal nerve palsy, mild, due to peroneal nerve trauma at the level of the fibular head.  Dr. Cantrell was dubious that any further diagnostic studies were indicated. Dr. Cantrell believed that the electrodiagnostic performed by Dr. Porecha and Dr. Kaplan were not accurate, which was not a new experience.  Dr. Cantrell believed Dr. Scott performed a quality study on May 5, 2006.  Based on a review of records, Dr. Cantrell noted that Plaintiff did not begin to complain of headaches until June 30, 2005.  A subsequent CT scan was normal.  Dr. Cantrell also found no evidence of a traumatic brain injury and no evidence that Plaintiff suffered a post-traumatic stress disorder.  Dr. Cantrell believed that Plaintiff needed to be rated under criteria for impairments due to  station and gait disorders.  He felt this was more appropriate than that of the peroneal nerve because Plaintiff had no discernible motor weakness and only an inconstant hypesthesia to pin prick over the left lateral leg.  AR 270-78.

On September 6, 2006, Dr. Jakubowski noted that Plaintiff's low back pain had stabilized. He agreed that Plaintiff was permanent and stationary.  No further treatment, aside from medications, would be supplied.  AR 281-82.

On October 2, 2006, Plaintiff reported that his medication did not help significantly with his left knee.  Dr. Jakubowski changed the medication.  AR 280.

On January 3, 2007, Dr. Miguel Hernandez completed a consultative internal medicine evaluation.  Following examination, Dr. Hernandez indicated that Plaintiff's left knee continued with significant arthritis, limitations in range of motion, tenderness and swelling.  Plaintiff's liver contusion and rib contusion were both stable.  Dr. Hernandez opined that Plaintiff could stand and/or

walk about two hours in an eight-hour workday due to significant left knee osteoarthritis status post fracture and surgery.  Plaintiff could sit about six hours in an eight-hour workday.  Dr. Hernandez noted that Plaintiff used a neoprene brace for knee support, but would not be surprised if Plaintiff required a cane for some stability and support.  Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently.  He had postural limitations on bending, stooping, crouching and climbing, especially in a repetitive manner due to his left knee.  Plaintiff had no apparent manipulative or environmental limitations.  AR 306-10.

On January 9, 2007, Plaintiff reported feeling dizzy with Vicodin.  Dr. Jakubowski prescribed Lortab in place of Vicodin.  AR 313.

On January 10, 2007, Plaintiff was treated in the emergency room for hypoglycemia after being found vomiting in the park.  Plaintiff reportedly had taken his insulin, but forgot to have any food.  AR 322-23, 326-31.

On January 11, 2007, Plaintiff underwent chest x-rays.  He gave suboptimal inspiratory effort, but there was no evidence of any gross cardiopulmonary disease.  AR 478.

On January 18, 2007, Dr. W. G. Jackson, a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment form.  Dr. Jackson opined that Plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently, could stand and/or walk at least 2 hours in an 8-hour workday and could sit about 6 six hours in an 8-hour workday.  Dr. Jackson further opined that Plaintiff could not push or pull with his left leg and could never balance.  He occasionally could climb, stoop, kneel, crouch and crawl.  He had no manipulative, visual or communicative limitations, but must avoid all exposure to hazards and uneven terrain.  AR 332-36.

In July 2007, Dr. Jakubowski noted significant difficulty assisting Plaintiff with pain management due to "UR opinions."  AR 434.

On September 5, 2007, Dr. Jakubowski opined that Plaintiff was capable of performing work at the sedentary level.  Plaintiff could occasionally lift 20 pounds and frequently lift 20 pounds during an 8-hour workday.  He could sit 45-60 minutes at one time and could stand and/or walk 20 minutes at one time.  Over an 8-hour period, he could sit 5-6 hours and stand and/or walk 2 hours.

1    He did not need to lie down or elevate his legs, but could not squat, kneel, climb ladders or walk on

2    uneven ground.  Dr. Jakubowski believed Plaintiff had been disabled to this degree since September

3    21, 2004.  AR 397.

4         In November 2007, Plaintiff twice received emergency treatment for hypoglycemia.  AR 398-

5    418.

6    **Psychological/Mental Health Evidence**

7         On January 6, 2006, Randall C. Epperson, Ph.D., a Qualified Medical Examiner, completed a

8    psychological evaluation report.  Plaintiff's wife reported that Plaintiff's mood was chaotic and his

9    temper violent after the accident.  He started constantly arguing, yelling, using profanity and verbally

10   abusing her and the children.  He also was disoriented, stressed and unaware of what he was doing or

11   saying.  He lost total control twice and had to be held down by family members.  Plaintiff had not

12   been referred to psychology or psychiatry for treatment and had not received any psychiatric

13   medication.  He complained of head pain that felt like "poking."  He also reported feeling confused

14   and disoriented with difficulty concentrating.

15        During the interview and testing, Plaintiff was subtly annoyed with questions and was a little

16   irritable.  His mood was dysphoric.  His affect was dysphoric, muted and irritable.  He looked

17   fatigued and the general impression was adjustment disorder with depression, some PTSD elements

18   and anger.  Plaintiff was slow on testing and the evaluation had to be completed over two days.  His

19   mental speed had declined to the borderline impaired range at the 8th percentile when compared to

20   other males with his background.  Memory findings demonstrated that Plaintiff was able to improve

21   with repetition, but had difficulty imposing his own structure on unorganized material.  Two

22   measures of intellectual level were obtained.  On one measure, he obtained an IQ equivalent of 80,

23   which was at the bottom of the low average range at the 9th percentile.  On the other measure, he

24   obtained an IQ equivalent of 62, which was at the 1st percentile.  Additionally, Plaintiff's depression

25   inventory score was in the severe range.  The MMPI-2 clinical scales showed elevation in

26   depression, hypochondriasis and hysteria.  The depression was accompanied by anxious ruminative

27   worry, cognitive inefficiency, lower energy level and social isolation.  The profile indicated a distress

28

1  syndrome with multiple somatic complaints, usually involving headaches and insomnia.  Dr.

2  Epperson diagnosed pain disorder with medical and psychological factors (stress-exacerbated pain),

3  adjustment disorder with mixed depression and anxiety (somatic anxiety and some elements of

4  PTSD), cognitive disorder, post-traumatic, mild, and post-traumatic personality change with loss of

5  temper control, along with a GAF of 55 moderate-serious (depressed mood and affect, social

6  withdrawal from friends, conflicts with family, suicidal ideation, unable to hold a job).  Dr. Epperson

7  opined that Plaintiff had a slight impairment in the ability to comprehend and follow instructions and

8  no impairment in the ability to perform simple and repetitive tasks.  He had moderate impairments in

9  the ability to maintain a work pace appropriate to a given work load, in the ability to perform

10  complex and varied tasks, in the ability to relate to people beyond giving and receiving instructions,

11  in the ability to influence people, in the ability to make generalizations, evaluations or decisions

12  without immediate supervision and in the ability to accept and carry out responsibility for direction,

13  control and planning.  Dr. Epperson recommended treatment for post head injury anger, an

14  antidepressant, outpatient psychotherapy, stress management, anger management and pain

15  management training.  AR 207-24, 225-27.

16       On January 20, 2007, Roxanne Morse, Ph.D., completed a consultative psychological

17  assessment.  Plaintiff reported that he continued to perform the activities of daily living though his

18  pain level remained at a 6 or 7.  On examination, Plaintiff did not speak English, but was able to

19  follow instructions and 2-step commands.  He was alert and oriented, with adequate attention and

20  concentration.  His conversational speech was slow and impoverished and he had difficulty finding

21  words.  His memory appeared grossly intact and he was able to recite up to 5 digits forward and 2

22  digits in reverse.  His ability to perform mathematical calculations was poor and his verbal reasoning

23  was mildly impaired.  He had marked difficulty answering questions requiring abstract reasoning.

24  His affect was restricted in range.  Based on testing, Plaintiff had borderline cognitive functioning

25  and performance measures of his intellectual functioning were consistently in the borderline range.

26  Dr. Morse diagnosed Plaintiff with pain disorder associated with psychological factors and a general

27  medical condition, adjustment disorder with depressive features and borderline intellectual

28

1  functioning.  Dr. Morse reported that Plaintiff was able to understand, remember and carry out

2  simple instructions, but he had marked difficulty with detailed and complex instructions.  Plaintiff

3  also had mild to moderate difficulty maintaining attention, concentration, pace and persistence.  Dr.

4  Morse indicated that Plaintiff had marked difficulty enduring the stress of the interview and testing

5  process as a result of his physical pain.  Dr. Morse opined that until such time as Plaintiff's

6  depression was stabilized "it would be difficult for him to maintain the necessary attention,

7  concentration, and pace to be able to work."  Based on observations and reported history, Plaintiff's

8  ability to interact with the public, supervisors and coworkers appeared impaired.  Dr. Morse also

9  opined that Plaintiff might benefit from assistance in managing his finances due to his arithmetic,

10  cognitive and psychiatric problems.  AR 341-45.

11       On February 6, 2007, Plaintiff complained of depression and insomnia.  His provider at

12  Golden Valley Health Services prescribed a trial of Paxil, but he refused counseling.  AR 462.

13       On February 9, 2007, Dr. E. B. Aquino-Caro, a state agency consultant, completed a

14  Psychiatric Review Technique form.  Given Plaintiff's adjustment disorder with mixed depression

15  and anxiety, Dr. Aquino-Caro opined that Plaintiff only had mild limitations of functioning and no

16  episodes of decompensation.  AR 346-56.  Dr. Aquino-Caro also completed a Mental Residual

17  Functional Capacity Assessment form.  Dr. Aquino-Caro opined that Plaintiff had moderate

18  limitations in the ability to understand and remember detailed instruction and in the ability to carry

19  out detailed instructions.  Plaintiff had no other significant limitations.  AR 357-59.

20       On March 16, 2007, Plaintiff's provider at Golden Valley Health Services opined that his

21  insomnia and depression were improved.  His Paxil was increased.  AR 461.

22       On June 8, 2007, Rosemary Tyl, a state agency medical consultant, completed a Psychiatric

23  Review Technique form.  The consultant opined that Plaintiff had borderline intellectual functioning,

24  which was an organic mental disorder, along with an adjustment disorder with depressive symptoms

25  and a pain disorder.  Plaintiff had moderate restriction of activities of daily living and moderate

26  difficulties in maintaining social functioning.  He also had marked difficulties in maintaining

27  concentration, persistence or pace.  There was insufficient evidence of repeated episodes of

28  decompensation.  AR 375-86.

Between July 2007 and May 2008, Dr. Jakubowski repeatedly noted that Plaintiff was negative for anxiety, depression and sleep disturbances.  AR 419, 422, 426, 429, 432, 435.

On December 19, 2007, Plaintiff's insomnia and depression were rated "good."  AR 457.

ALJ's Findings

The ALJ found that Plaintiff met the insured status requirements through December 31, 2009, and had not engaged in substantial gainful activity since September 21, 2004.  The ALJ further found that Plaintiff had the severe impairments of depression, borderline intellectual functioning and continued difficulties status post left lower extremity fracture.  Despite these impairments, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to sit for six hours, to stand up/walk for two hours in an eight hour workday, and to lift/carry 20 pounds occasionally and 10 pounds frequently.  He could never push/pull with his left lower extremities.  He could occasionally perform postural movements, but could never climb ladders, ropes or scaffolds and should avoid uneven terrain.  He could perform simple, repetitive tasks.  With this RFC, the ALJ concluded that Plaintiff could not perform any past relevant work, but could perform other jobs existing in the national economy.  AR 14-19.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the

13

proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See *Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g).  Applying the process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since September 21, 2004; (2) has an impairment or a combination of impairments that is considered "severe" (depression, borderline intellectual functioning, and continued difficulties status post left lower extremity fracture) based on the requirements in the Regulations (20 C.F.R. §§ 404.1520(c)), 416.920(c); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work; but (5) can perform jobs that exist in significant numbers in the national economy.  AR 14-19.

Here, Plaintiff contends that the ALJ erred by: (1) rejecting the opinions of examining psychologists, Drs. Epperson and Morse; (2) rejecting the opinion of state agency reviewing psychologist, Dr. Tyl; (3) rejecting Plaintiff's testimony; (4) failing to assess Plaintiff's mental residual functional capacity; and (5) relying on invalid VE testimony.

## DISCUSSION

A.    Opinions of Examining Psychologists

Plaintiff claims that the ALJ erred by failing to give reasons for rejecting certain aspects of

14

1   the examining psychologists' opinions.

2        In assessing Plaintiff's mental limitations, the ALJ found that Plaintiff retained the mental

3   capacity to perform simple, repetitive tasks.  AR 17.  The ALJ supported this finding by relying on

4   Dr. Epperson's opinion that Plaintiff had no impairment in his ability to perform simple and

5   repetitive tasks.  AR 223.  He also relied on the concurring opinion of Dr. Morse, who opined that

6   Plaintiff could understand, remember and carry out simple instructions.  AR 345.

7        Plaintiff argues that the ALJ ignored Dr. Epperson's finding that Plaintiff had a moderate

8   impairment in maintaining work pace and Dr. Morse's determination that it would be difficult for

9   Plaintiff to maintain the necessary attention, concentration, and pace to work.  AR 223, 345.  Like

10  Dr. Epperson, Dr. Morse noted mild to moderate difficulty maintaining attention, concentration, pace

11  and persistence.  AR 345.

12       Contrary to Plaintiff's suggestion, the ALJ was not required to address or accept each of the

13  discrete parts of Dr. Epperson's and Dr. Morse's opinions.  An ALJ is required to weigh and

14  evaluate medical evidence in the record, but is not required to accept all of a doctor's opinion.  The

15  ALJ need not believe everything a physician sets forth, and may accept all, some, or none of the

16  physician's opinions.  *Magallanes v Bowen*, 881 F.2d 747, 753-754 (9th Cir. 1989).

17       Further, findings of "moderate limitations" in the areas of concentration, persistence and pace

18  do not mandate a finding of disability.  This is particularly true where the doctors agreed that

19  Plaintiff maintained the ability perform simple, repetitive tasks.  *See Stubbs-Danielson v. Astrue*, 539

20  *F.3d 1169 (9th Cir. 2008)* (RFC finding that a claimant was limited to simple, routine and repetitive

21  work was sufficient despite the fact that it did not incorporate moderate limitations in the ability to

22  perform at a consistent pace); *see also McKenzie v. Astrue*, 2010 WL 1033193, *8-9 (E.D. Cal. Mar.

23  *19, 2010)* (RFC limitation to simple, repetitive tasks was sufficient despite doctor's finding that

24  claimant had moderate limitations regarding his ability to work a full day or week and maintain

25  concentration, persistence or pace); *McArthur v. Astrue*, 2008 WL 802327, *7-8 (E.D. Cal. Mar. 24,

26  *2008)*.  In this instance, the ALJ recognized that while certain assessments proposed additional

27  mental limitations, there was agreement amongst the doctors that Plaintiff maintained the ability to

28  perform simple, repetitive work tasks.  AR 17.

As additional evidence of record, the ALJ cited the consistent opinion of a state agency doctor, who opined that Plaintiff could perform simple, repetitive tasks.  AR 17, 357-59.  The reports of nonexamining advisors "need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Andrews v Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997).  Thus, the ALJ's determination was in accord with the reports of two examining and one nonexamining physician, which indicated that Plaintiff was capable of simple, repetitive tasks.  Substantial evidence therefore supported the ALJ's conclusion.

Insofar as Plaintiff suggests that the ALJ should have accepted Dr. Morse's conclusion that Plaintiff could not sustain work, this suggestion is without merit.  A doctor's statement about a claimant's ability to work is not a proper medical source opinion, but an administrative finding reserved to the Commissioner.  Social Security Ruling ("SSR") 96-5p. Disability has both a medical and vocational component. See 20 C.F.R. § 404.1560.  Because a medical source does not have the expertise to comment on the vocational component of disability, a statement by a medical source that a person is unable to work is not accorded much weight. See 20 C.F.R. § 404.1527(e)(1).  The ALJ must consider medical opinions about a claimant's condition and functional limitations, along with all other evidence in the record, to determine whether a claimant is disabled under the Social Security Act. SSR 96-5p.  Here, the ALJ considered both Dr. Morse's and Dr. Epperson's opinions, but found that Plaintiff's treatment records and activities did not support any restrictions greater than a limitation to simple, repetitive tasks.  AR 17.

According to the record, Plaintiff's borderline intellectual functioning did not preclude him from performing simple tasks.  The ALJ considered Plaintiff's testimony that he attended church about three times a month and drove a van daily to drop off and pick up his children from school.  Plaintiff also reported that he took care of his wife and children, did laundry, went grocery shopping, read, paid bills and handled a savings account.  AR 16, 25-26, 29, 107-08, 111-14.  The record is also devoid of any longitudinal mental health treatment.  Although Plaintiff was prescribed an antidepressant in February 2007, Plaintiff declined any counseling.  AR 462.  While taking the antidepressant, Plaintiff's depression was noted to be both improved and "good."  AR 457, 461.

1   Further, between July 2007 and May 2008, Dr. Jakubowski opined that Plaintiff was negative for

2   anxiety, depression and sleep disturbances.  AR 419, 422, 426, 429, 432, 435.

3       Based on the above, the ALJ's analysis of the medical opinions is supported by substantial

4   evidence and free of legal error.

5   B.      Opinion of State Agency Physician, Dr. Tyl

6       Plaintiff next contends that the ALJ improperly rejected the opinion of reviewing

7   psychologist, Dr. Tyl.  In particular, Plaintiff faults the ALJ for neither mentioning nor providing any

8   reason for rejecting Dr. Tyl's opinion.  AR 383.

9       Evidence from state agency psychologists must be treated as expert nonexamining sources.

10  The ALJ "may not ignore these opinions and must explain the weight given to these opinions in their

11  decisions."  SSR 96-6p.

12      Here, Dr. Tyl completed a psychiatric review technique form and opined that Plaintiff had

13  marked difficulties in maintaining concentration, persistence or pace.  AR 383.  The ALJ did not

14  discuss Dr. Tyl's opinion.  Instead, he based his RFC finding on the opinion of two examining

15  physicians and another nonexamining state agency physician.  The ALJ erred in failing to give any

16  reasons for rejecting Dr. Tyl's opinion. *See Shafer v. Astrue*, 518 F.3d 1067, 1069-1070 (9th

17  Cir.2008) (noting that an ALJ's silent disregard of a nonexamining physician's opinion "contravened

18  governing regulations requiring him to ... evaluate every medical opinion received" and was legal

19  error); 20 C.F.R. § 404.1527(d),(f) (stating that nonexamining source opinions are medical opinions

20  that the ALJ must consider and weigh using the factors enumerated in that section); SSR 96-6p

21  (stating that an ALJ "may not ignore" state agency medical consultant opinions "and must explain

22  the weight given to these opinions in their decisions").

23      However, the ALJ's error was harmless.  *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir.

24  2005) ("A decision of the ALJ will not be reversed for errors that are harmless.").  As an initial

25  matter, Dr. Tyl did not provide any RFC findings describing Plaintiff's capabilities despite his

26  limitations.  AR 387-89; 20 C.F. R. § 404.1545.  Further, the ALJ properly relied on the opinions of

27  two examining psychologists, to which he was entitled to give more weight.  *Orn v. Astrue*, 495 F.3d

28  625, 631 (9th Cir. 2007); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (an examining

17

1  physician's opinion is entitled to more weight than a nonexamining physician's opinion).  As

2  discussed above, the examining psychologists both found Plaintiff capable of performing simple,

3  repetitive tasks.  *See Erickson v. Shalala*, 9 F.3d 813, 818 n. 7 (9th Cir.1993) ("[T]he non-examining

4  physicians' conclusion, *with nothing more*, does not constitutes substantial evidence, particularly in

5  view of the conflicting observations, opinions, and conclusions of an examining physician.")

6  (quoting *Pitzer v. Sullivan*, 908 F.2d 502, 506 n. 4 (9th Cir.1990)).

7       Finally, and contrary to Plaintiff's assertion, Dr. Tyl's finding that Plaintiff had marked

8  difficulties in maintaining concentration, persistence or pace was not consistent with the findings of

9  examining psychologists, Drs. Morse and Epperson.  Dr. Morse assessed Plaintiff with only mild to

10  moderate difficulty maintaining concentration, persistence and pace, while Dr. Epperson opined that

11  Plaintiff only had a moderate impairment in his ability to maintain a work pace appropriate to a

12  given work load.  AR 223, 345.  For these reasons, the ALJ did not commit reversible error.

13  C.     Credibility

14       Plaintiff next argues that the ALJ failed to provide clear and convincing reasons for rejecting

15  his testimony.

16       In *Orn v. Astrue*, 495 F.3d at 635, the Ninth Circuit summarized the pertinent standards for

17  evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

18          An ALJ is not "required to believe every allegation of disabling pain" or other
           non-exertional impairment. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989).
19          However, to discredit a claimant's testimony when a medical impairment has been
           established, the ALJ must provide " 'specific, cogent reasons for the disbelief.' "
20          *Morgan*, 169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the
           reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ
21          did not find "affirmative evidence" that the claimant was a malingerer, those "reasons
           for rejecting the claimant's testimony must be clear and convincing." *Id.*
22
           Social Security Administration rulings specify the proper bases for rejection of
23          a claimant's testimony ... An ALJ's decision to reject a claimant's testimony cannot be
           supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at
24          57860 ("Although Social Security Rulings do not have the same force and effect as
           the statute or regulations, they are binding on all components of the Social Security
25          Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see*
           *Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's
26          decision at step three of the disability determination was contrary to agency
           regulations and rulings and therefore warranted remand). Factors that an ALJ may
27          consider in weighing a claimant's credibility include reputation for truthfulness,
           inconsistencies in testimony or between testimony and conduct, daily activities, and
28          "unexplained, or inadequately explained, failure to seek treatment or follow a

prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

Here, the ALJ found Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were not credible for several reasons.  First, the ALJ found that Plaintiff had described daily activities which were not limited to the extent one would expect.  An ALJ is permitted to consider daily living activities in the credibility analysis.  *Burch*, 400 F.3d at 680-81 (upholding ALJ's credibility finding that claimant's daily activities suggested she was "quite functional" where she cared for her own personal needs, cooked, cleaned, shopped, interacted with her nephew and her boyfriend and managed her own funds).  Here, the ALJ cited Plaintiff's testimony and statements that he attended church, occasionally cleaned, drove a van daily to drop off and pick up his children from school, lifted shopping bags up to 100 feet once per week, spent 30 minutes washing his car, took care of his wife and children, did laundry four hours a week, went grocery shopping, read, paid bills and handled a savings account.  AR 16.  Plaintiff has not challenged this portion of the ALJ's credibility findings.

The ALJ also discounted Plaintiff's credibility because Plaintiff reported in a questionnaire that he had difficulty walking and finishing chores due to knee pain, but also reported that he only used a cane when he had pain, which was once every 15 days.  AR 16, 109.  An ALJ may consider inconsistencies in a claimant's testimony when assessing credibility.  *Tonapetyan*, 242 F.3d at 1148 (ALJ may engage in ordinary techniques of credibility evaluation, such as considering inconsistencies in claimant's testimony).

Plaintiff contends that the ALJ misinterpreted his pain testimony, asserting that he testified to using his cane when he has pain <u>and</u> has to walk a long distance.  Plaintiff states that he has pain every day.  Opening Brief pp. 15-16.  According to the transcript, Plaintiff testified that he uses his cane when he knows he has to "walk a lot."  AR 27.  However, in a questionnaire, Plaintiff reported that he only used a cane when he had pain, "1 time every 15 days."  AR 109.  Given Plaintiff's written statement, the ALJ reasonably concluded that Plaintiff "only used a cane when he had pain and that was once every 15 days."  AR 16.  An ALJ may draw reasonable inferences from the record. *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).

In addition, the ALJ considered his own observations from the hearing, as well as observations from a Social Security Administration employee during an interview.  AR 16.  An ALJ may rely on such observations in assessing credibility.  *See Orn*, 495 F.3d at 639 (ALJ's observations of a claimant's functioning at the hearing are permissible as part of overall credibility assessment); *Tonapetyan*, 242 F.3d at 1148 (noting that the ALJ may rely on his observations as part of an overall credibility determination); SSR 96-7p (observations made by SSA employees during interviews and the ALJ's own recorded observations of the claimant during the hearing are all relevant to credibility evaluation).  Plaintiff has not challenged this portion of the ALJ's credibility determination.  Rather, Plaintiff contends that the ALJ failed to consider several specific factors identified in SSR 96-7p.

SSR 96-7p provides factors that may be considered to determine a claimant's credibility, such as: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain and other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

An ALJ is not required to discuss and analyze each and every one of the factors enumerated in SSR 96-7p.  *See, e.g., Howard v. Astrue*, 2010 WL 546715, *13 (E.D. Cal. Feb. 10, 2010) (plaintiff incorrectly argued that SSR 96-7p sets forth mandatory factors that an ALJ must analyze); *Collins v. Astrue*, 2009 WL 1202891, *6 (C.D. Cal. Apr.27, 2009); *O'Neal v. Barnhart*, 2006 WL 988253, *12 n. 7 (C.D. Cal. Apr.13, 2006).  Instead, the ALJ must give consideration to these factors.  *See* SSR 96-7p.

Here, the record as a whole reflects adequate consideration of these factors.  For instance, the ALJ elicited testimony regarding Plaintiff's daily activities (AR 25-26, 29, 31), the location, duration, frequency, and intensity of his pain and other symptoms (AR 27-29), the factors that precipitate and aggravate the symptoms (AR 29-30), the type, effectiveness, and side effects of any

1    medication (AR 28), his treatment (AR 27-28), any measures other than treatment to relieve pain or

2    other symptoms (AR 29) and any other factors concerning his functional limitations and restrictions

3    (AR 30-31, 35). The ALJ also received testimony regarding Plaintiff's work history.  AR 26, 32.

4          Plaintiff essentially asserts that the ALJ failed to give proper consideration to Plaintiff's

5    complaints and statements regarding his mental limitations, including memory, concentration,

6    completing tasks, following instructions, handling stress and irritability.  Opening Brief, p. 16.

7    However, the ALJ took into account Plaintiff's mental limitations by making a RFC finding that

8    Plaintiff could perform only simple, repetitive tasks.  AR 15.

9          For the reasons discussed above, the ALJ has provided specific, cogent reasons for

10   discounting Plaintiff's credibility.

11   D.    Mental Residual Functional Capacity Assessment

12         Plaintiff argues that the ALJ's mental RFC finding for simple, repetitive work failed to

13   account for his finding of moderate difficulties in concentration, persistence, or pace.  Opening Brief,

14   pp. 17-18.  As discussed above, the Court disagrees.

15         In *Stubbs-Danielson*, the claimant argued that the ALJ's RFC for simple, routine, repetitive

16   work failed to capture a moderate limitation in the ability to perform at a consistent pace.  Even

17   though the vocational expert testified that anything more than a mild limitation with respect to pace

18   would preclude employment, the ALJ rejected this conclusion, in part, because it did not address the

19   claimant's RFC.  In concluding that the ALJ's RFC properly incorporated the limitations regarding

20   attention, concentration and adaptation, the Court explained:

21              The ALJ translated Stubbs-Danielson's condition, including the pace and mental
           limitations, into the only concrete restrictions available to him-Dr. Eather's recommended
22         restriction to "simple tasks."  This does not, as Stubbs-Danielson contends, constitute a
           rejection of Dr. McCollum's opinion.  Dr. Eather's assessment is consistent with Dr.
23         McCollum's 2005 MRFCA, which found Stubbs-Danielson is "not significantly limited" in
           her ability to "carry out very short simple instructions," "maintain attention and concentration
24         for extended periods," and "sustain an ordinary routine without special supervision."  As two
           of our sister circuits have recognized, an ALJ's assessment of a claimant adequately captures
25         restrictions related to concentration, persistence, or pace where the assessment is consistent
           with restrictions identified in the medical testimony.  See Howard v. Massanari, 255 F.3d
26         577, 582 (8th Cir.2001) (where state psychologist both identified claimant as having
           deficiencies of concentration, persistence or pace and pronounced claimant possessed the
27         ability to "sustain sufficient concentration and attention to perform at least simple, repetitive,
           and routine cognitive activity without severe restriction of function," ALJ's hypothetical
28         including ability to perform "simple, routine, repetitive tasks" adequately, captured

                                          21

claimant's deficiencies in concentration persistence or pace); Smith v. Halter, 307 F.3d 377, 379 (6th Cir.2001) (where ALJ's hypothetical incorporated concrete restrictions identified by examining psychiatrist regarding quotas, complexity, and stress, ALJ did not err in failing to include that claimant suffered from deficiencies in concentration, persistence, or pace).

The Eighth Circuit's decision in *Howard* is directly on point.  There, the court explicitly rejected a claim that an ALJ's hypothetical describing an ability to do "simple, routine, repetitive work" failed to capture deficiencies in concentration, persistence, or pace.  The court noted the state psychologist's findings which concluded that the claimant, despite certain pace deficiencies, retained the ability to do simple, repetitive, routine tasks.  See Howard, 255 F.3d at 582.  The medical evidence by Dr. Eather in the present case reflects the same conclusion.

539 F.3d at 1174.

Based on this Circuit's precedent, the ALJ did not err by finding that Plaintiff was capable of simple, repetitive work.  The ALJ's determination is supported by evidence demonstrating that Plaintiff could perform simple, repetitive tasks.  The reports of two examining physicians and one nonexamining physician all indicated that Plaintiff was capable of simple, repetitive tasks.  Thus, the ALJ's mental RFC finding is supported by substantial evidence.  *Tonapetyan*, 242 F.3d at 1149 (examining physician opinion serves as substantial evidence supporting an ALJ's findings); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (state agency determination consistent with other evidence in the record constitutes substantial evidence).

E.      Vocational Expert Testimony

Plaintiff contends that the testimony of the VE was invalid.  Plaintiff first claims that the VE improperly testified that a person who can stand for two hours per day could perform the job of small parts assembler (DOT 706.684.-022), which is light work requiring a person to stand for up to six hours per day.  However, the VE also identified two sedentary jobs.  AR 34.  Thus, even if the ALJ could not rely the small parts assembler job, the VE identified at least two additional jobs on which the ALJ could rely.

Plaintiff asserts that the ALJ could not rely on the two remaining sedentary jobs, because the VE reported that the Dictionary of Occupational Titles ("DOT") did not account for English illiteracy and the VE cited only his experience in eroding the occupational base to account for this limitation.  AR 35.  In short, Plaintiff faults the VE for failing to offer any *other* explanation for his deviation from the DOT.

1    The Ninth Circuit has observed that SSR 00-4p "explicitly require[es] that the ALJ determine

2    whether the [vocational] expert's testimony deviates from the *Dictionary of Occupational Titles* and

3    whether there is a reasonable explanation for any deviation." *Massachi v. Astrue*, 486 F.3d 1149,

4    1153 (9th Cir. 2007).  This is not a situation in which the ALJ failed to ask or the VE failed to offer

5    any explanation for deviation from the DOT.  Indeed, the VE expressly testified that he deviated

6    from the DOT because it did not account for English illiteracy.  The VE further testified that he

7    eroded the occupational base by relying on his experience in dealing with employers and helping

8    individuals back to work.  AR 35.  Given the explanation provided by the VE, the ALJ could

9    properly rely on his testimony.  *See Bayliss v. Barnhart*, 427 F.3d 1211 (9th Cir.2005) ("an ALJ may

10   take administrative notice of any reliable job information, including information provided by a VE"

11   because the "VE's recognized expertise provides the necessary foundation for his or her testimony

12   and "no additional foundation is required"); *see also Buchanan v. Astrue*, 2010 WL 599888, at *13

13   (E.D. Cal. Feb., 18, 2010) (finding that VE's experience and census data constituted persuasive

14   evidence of deviation from DOT).

15                                      **RECOMMENDATION**

16        Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

17   evidence and is based on proper legal standards.  Accordingly, the Court RECOMMENDS that

18   Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be

19   DENIED and that JUDGMENT be entered for Defendant Michael J. Astrue and against Plaintiff

20   Jose Maria Diaz Zepeda.

21        These findings and recommendations will be submitted to the Honorable Oliver W. Wanger

22   pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served

23   with these findings and recommendations, the parties may file written objections with the court.  The

24   document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

25   The parties are advised that failure to file objections within the specified time may waive the right to

26   appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

27        IT IS SO ORDERED.

28   **Dated:    March 24, 2011**                          **/s/ Dennis L. Beck**
                                                    UNITED STATES MAGISTRATE JUDGE

23